# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| MICHAEL MORRONE, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 17-2783 |
| | : | |
| JEANES HOSPITAL and KAREN NEALE, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                               **JULY 26, 2018**

      Plaintiff Michael Morrone ("Morrone") filed suit in this Court against Defendants Jeanes Hospital ("Jeanes") and Karen Neale ("Neale") (collectively, "Defendants"), alleging violations of interference and retaliation under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, and common law wrongful discharge for workers' compensation retaliation.

      Presently before the Court is Defendants' Motion for Summary Judgment, which seeks dismissal of all claims in the action. Morrone has filed a Brief in Opposition, and Defendants have filed a Reply Brief. For the reasons that follow, Defendants' Motion is denied.

## I.     BACKGROUND

      Jeanes hired Morrone as a respiratory therapist in 1992, and his title later changed to senior respiratory therapist. (Pl.'s Br. Opp'n Defs.' Mot. Summ. J. 6.) As a senior respiratory therapist, he was responsible for "perform[ing] prescribed diagnostic and therapeutic interventions and function[ed] as a resource person to achieve therapeutic goals in the care of [a] patient's cardiopulmonary dysfunctions with special expertise in the practice of a subspecialty in

Respiratory Care, such as diagnostic testing such as pulmonary function or bronchoscopy." (Defs.' Mem. Law Supp. Mot. Summ. J., Ex. 4 (Senior Respiratory Therapist Job Profile) at 1.)

Between March 2014 and June 2015, Neale, who at the time was a Respiratory Therapist Supervisor, supervised Morrone. (Pl.'s Br. Opp'n Defs.' Mot. Summ. J. 7.) In June or July 2015, Neale became Respiratory Department Director and Paulette Vogler ("Vogler") became the Respiratory Therapist Supervisor. (*Id.* at 7-8.) Both Neale and Vogler had the authority to hire, discipline, and terminate respiratory therapists. (*Id.* at 8) (citing Ex. D ("Neale Dep.") at 17-18; Ex. E ("Vogler Dep.") at 9-10).

In October 2016, Dr. Mary Ann Devine directed Morrone on the transport of a patient. (Defs.' Mem. Law Supp. Mot. Summ. J. 4.) While Morrone was eating his lunch later in the day, he spoke to Vogler about the complicated transport and that he would be receiving a "heart" (a patient returning from open-heart surgery). (*Id.* at 5.) Vogler stated she would meet Morrone on the floor when the patient came out of heart surgery. (*Id.*) When that time came, Morrone called Vogler's office, but she did not immediately appear. (*Id.*) Lindsey Howard ("Howard"), another respiratory therapist, offered to take care of the heart patient while Morrone made his transport. (*Id.*) Howard informed Morrone that her badge would not scan to run the "blood gas machine," which was necessary for the heart patient. (*Id.*)

Respiratory therapists at Jeanes have badges not only for identification purposes, but also for credentials that allow them to access certain equipment. (*Id.* at 4.) Jeanes has a policy that prohibits employees from "assist[ing] others in gaining unauthorized access to Resources or accounts on the [Temple University Health System, Inc.] Network or any other system, including [the employee's] own account." (*Id.*, Ex. 8 (Computer Usage Policy).) Notably, Howard's own badge would not have allowed her to run the blood gas machine. (*Id.* at 5.) Vogler later learned

2

that Howard operated the blood gas machine by using Morrone's badge, resulting in Vogler informing Neale about the situation. (*Id.*) Neale and Vogler suspended Morrone and Howard for one day. (*Id.*) Morrone served his suspension on November 2, 2016, and he understood that any future infractions could result in termination. (*Id.* at 5-6.)

On November 25, 2016, Morrone injured his knee at work while going up stairs to care for a patient. (Pl.'s Br. Opp'n Defs.' Mot. Summ. J. 10.) He received an MRI a few days later and was diagnosed with a medial meniscus tear in his right knee. (*Id.*) Morrone then reported the knee injury to Vogler on December 3, 2016, and a workers' compensation claim was initiated that same day. (*Id.*) Morrone also requested and took time off from work as a result of the knee injury beginning on approximately December 8, 2016. (*Id.* at 11.) His FMLA medical leave lasted from December 8, 2016 to February 18, 2017. (*Id.* at 12.) At the time he took his FMLA leave, Morrone worked forty hours per week as a full-time senior respiratory therapist. (*Id.*)

By letter dated February 21, 2017, Jeanes informed Morrone that his leave exhausted on February 18, 2017. (*Id.* at 14.) On March 6, 2017, Morrone hand-delivered to Vogler his medical clearance, which stated he could return to work on March 10, 2017. (*Id.* at 15.) Morrone alleges that Neale required him to wait another two weeks, until approximately the end of March 2017, to return to work, and that upon returning, reduced his hours from forty per week to thirty-six. (*Id.* at 17.) Also, once he returned to Jeanes at the end of March 2017, his title was changed from "senior respiratory therapist" to "respiratory therapist." (*Id.* at 24.)

On April 8, 2017, a patient required the administration of Aerosolized Epoprostenol ("Flolan"). (Defs.' Mem. Law Supp. Mot. Summ. J. 6.) Morrone requested the assistance of Kay Park ("Park"), who was a nurse, and Janice Cook ("Cook"), who was another respiratory therapist, in providing the medication. (Pl.'s Br. Opp'n Defs.' Mot. Summ. J. 30) (citing Ex. A

3

("Morrone Dep.") at 91-92). In doing so, Cook "bagged" the patient, which means the patient was taken off the ventilator and manually resuscitated. (Morrone Dep. 92-93.) Park changed the pump and Morrone changed the nebulizer. (*Id.*) After the process was complete, Morrone wrote in his clipboard what he and Park had done, but he did not verify Park's work. (*Id.* at 94.) Jeanes' policy regarding Flolan provides that only a respiratory care practitioner is permitted to administer the medication. (*Id.* at 95-96.)

On the night of April 8, 2017, Vogler received a phone call from Rebecca Redling ("Redling"), a respiratory therapist who took over when Morrone's shift ended. (Vogler Dep. 51.) Redling explained that she went to check on the patient who was being administered Flolan and noticed that the pump was set up incorrectly, resulting in the patient receiving no medication. (*Id.* at 51-52.) Vogler told Redling to have a private conversation with Morrone about the observation. (*Id.* at 52-53.) When Redling and Morrone spoke, Morrone said the mistake was not his fault because the nurse set up the Flolan pump. (*Id.* at 53.)

Vogler notified Neale of the incident, and the two then informed Marie Gardner ("Gardner"), the "HR business partner" at Jeanes, of the infraction. (*Id.* at 52.) Vogler and Neale met with Morrone to discuss what occurred, during which he admitted that Park set up the pump and that he did not check it. (*Id.* at 55-56.) Vogler and Gardner interviewed Cook, who did not observe what Morrone or Park were doing because she was solely focused on bagging the patient. (*Id.* at 59.) Cook was not disciplined because she was not responsible for the patient. (*Id.* at 61.) Park was given a counseling note because the administration of Flolan, albeit improperly, was outside the scope of her responsibilities.

Numerous individuals, including Gardner, the Vice President of Human Resources, Beverly Sherbondy, the Chief Nursing Officer, Denise Frasca, and Neale, met collectively to

4

discuss the infraction and ultimately determined that Morrone's appropriate level of discipline was termination. (Defs.' Mem. Law Supp. Mot. Summ. J. 8) (citing Ex. 12 ("Gardner Dep.") at 90-91). The termination assessment was made based on the blood gas machine incident in October 2016 in conjunction with the Flolan error. (*Id.* at 91-94.) Jeanes terminated Morrone on April 17, 2017.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) states that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" *Compton v. Nat'l League of Prof'l Baseball Clubs*, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998) (quoting *Liberty Lobby*, 477 U.S. at 255).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts

showing that there is a genuine issue for trial." *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. *Tziatzios v. United States*, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines there are no genuine disputes of material fact, then summary judgment will be granted. *Celotex*, 477 U.S. at 322.

## III. DISCUSSION

### A. FMLA Interference

Count I of Morrone's Complaint asserts a cause of action for FMLA interference. To make a claim of interference under the FMLA, Morrone must establish that: (1) he was an eligible employee under the FMLA; (2) the employer was subject to the FMLA's requirements; (3) he was entitled to take FMLA leave; (4) he gave notice to the defendant of his intention to take FMLA leave; and (5) he was denied benefits to which he was entitled. *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 252 n.2 (3d Cir. 2014) (citing *Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014)). Moreover, "[a]fter a period of qualified leave, an employee is entitled to reinstatement to his former position or an equivalent one with 'equivalent employment benefits, pay and other terms and conditions of employment.'" *Sommer v. The Vanguard Grp.*, 461 F.3d 397, 399 (3d Cir. 2006) (quoting 29 U.S.C. § 2614(a)(1)); *see also Budhun*, 765 F.3d at 252 (citation omitted).

Defendants move for summary judgment on Morrone's claim for FMLA interference on the sole basis that he cannot satisfy the fifth element—that he was denied benefits to which he was entitled—because he received twelve weeks of FMLA-designated leave and "was restored to [the] same position with equivalent benefits and with conditions of employment comparable to

those he had when he left." (Defs.' Mem. Law Supp. Mot. Summ. J. 12.) Morrone responds with a myriad of facts that he claims constitutes FMLA interference. (*See* Pl.'s Br. Opp'n Defs.' Mot. Summ. J. 45-46.) We believe there is at least one genuine dispute of material fact that prevents the entry of summary judgment in favor of Defendants on the interference claim: the reduction in Morrone's hours from forty per week to thirty-six when he returned from FMLA leave.

Regarding Morrone's reduction in hours from forty per week to thirty-six, Defendants respond by noting that Neale had a conversation with Morrone before he took FMLA leave that his hours would need to be reduced for consistency within the department. (Defs.' Reply Br. 6.) However, Morrone directly disputed this fact in his deposition testimony. At deposition, he testified that Neale and Vogler, at different times, asked if he would like to work thirty-six hours per week instead of forty. (Morrone Dep. 60.) He responded by saying he had a ten-year old child at the time and would prefer to continue with forty hours per week. (*Id.*) Both Neale and Vogler said he could stay at forty hours for at least the next four years. (*Id.*) Notably, Neale made the decision to reduce Morrone's hours in January 2017, when Morrone was on FMLA leave.

After drawing all reasonable inferences in favor of Morrone, and given his reduction of hours upon his return from FMLA leave, we cannot say he was restored "to his former position or an equivalent one with 'equivalent employment benefits, pay and other terms and conditions of employment.'" *Sommer*, 461 F.3d at 399 (quoting 29 U.S.C. § 2614(a)(1)). Neale specifically made the decision to reduce Morrone's hours while he was on FMLA leave, and there is evidence in the record that she informed him that he would be able to remain at forty

hours per week for several years. Accordingly, Defendants' Motion is denied as to the claim of FMLA interference.[1]

### B. FMLA Retaliation

Count I of Morrone's Complaint also asserts a cause of action for FMLA retaliation. The FMLA regulations prohibit employers from "discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." *Budhun*, 765 F.3d at 256 (quoting 29 C.F.R. § 825.220(c)).

Retaliation claims under the FMLA that are based on circumstantial evidence are governed by the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework. *Id.* First, the plaintiff must "establish that '(1) [he] invoked [his] right to FMLA-qualifying leave, (2) [he] suffered an adverse employment decision, and (3) the adverse action was causally related to [his] invocation of rights.'" *Id.* (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012)). Once the plaintiff establishes his prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). Once the employer meets its minimal burden, the employee must then come forward with evidence that the employer's reason for the adverse action is pretextual. *Id.* (citing *Lichtenstein*, 691 F.3d at 302).

---

[1] Morrone argues extensively that Jeanes is liable for FMLA interference because his ability to take FMLA leave was frustrated. For example, he argues, *inter alia*, that Jeanes failed to notify him of his FMLA rights, failed to provide him with FMLA paperwork, and failed to notify him of how much FMLA time he had remaining as of December 2016. (Pl.'s Br. Opp'n Defs.' Mot. Summ. J. 45.) While Morrone's arguments are potential theories of FMLA interference, the law is clear that such interference is actionable only if he can show prejudice as a result of any alleged violation. *See Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 144 (3d Cir. 2004).
   In this case, Morrone admits he was able to take all twelve weeks of FMLA-designated leave and does not argue prejudice in any manner. Accordingly, his particular arguments regarding Jeanes frustrating his ability to take FMLA leave are not actionable interference.

### 1. *Prima Facie Case*

Defendants concede the first two elements of Morrone's prima facie case and move for summary judgment on the basis that he cannot establish that his adverse employment action was causally related to the invocation of his FMLA rights. (Defs.' Mem. Law Supp. Mot. Summ. J. 14-15.) In particular, Defendants argue that the causal link is missing because the adverse employment action—Morrone's termination—came nearly two months after his FMLA protected activity ended. (*Id.*)

The United States Court of Appeals for the Third Circuit has held that, to establish the requisite causal connection, a plaintiff "must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir. 1997)). "Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)). While there is no bright-line rule as to what amount of time is unusually suggestive, "a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." *Id.* at 233 (citing *Clark*, 532 U.S. at 273). If the temporal proximity is not unusually suggestive, then we must look to whether the proffered evidence, as a whole, supports an inference of discrimination. *Id.* at 232 (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)). "Among the kinds of evidence that a

plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *Id.* at 232-33 (citing *Farrell*, 206 F.3d at 279-81).

In this case, Defendants note that Morrone's protected activity ended when his FMLA leave expired on February 18, 2017. (Defs.' Mem. Law Supp. Mot. Summ. J. 16.) However, the parties disagree about what constitutes the adverse action. Defendants argue that Morrone's April 2017 termination is the adverse action, whereas Morrone claims, *inter alia*, that his reduction in hours and change in title upon returning from FMLA constitutes the adverse actions. Therefore, we must resolve this issue for purposes of evaluating the temporal proximity argument.

The Third Circuit has defined "adverse employment action" as "an action that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" *Budhun*, 765 F.3d at 257 (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)). Of course, Defendants are correct in noting that Morrone's termination constitutes an adverse action. However, we believe that Morrone's reduction in hours, and the corresponding factual dispute as to whether Neale and Vogler told him that he would remain at forty hours per week for the next four years, prevents the entry of summary judgment in favor of Defendants. Morrone's compensation, terms, and conditions of employment were necessarily altered by having his hours reduced. Therefore, Morrone suffered an adverse employment action when he was informed on March 9, 2017 about the reduction of his hours.

Having determined that Morrone's reduction in hours constitutes an adverse employment action, we must now look to whether the temporal proximity between it and the FMLA-protected activity was unusually suggestive to create an inference of retaliation. Even if the timing between the protected activity and the adverse action is not unusually suggestive to establish a causal connection, "courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee . . . or other types of circumstantial evidence . . .' that would give rise to an inference of causation when considered as a whole." *Kieffer v. CPR Restoration & Cleaning Serv., LLC*, 200 F. Supp. 3d 520, 539 (E.D. Pa. 2016), *aff'd sub nom. Kieffer v. CPR Restoration & Cleaning Servs., LLC*, No. 16-3423, --F. App'x --, 2018 WL 2215436 (3d Cir. May 15, 2018) (first ellipses in original) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007)).

Morrone has sufficiently put forth evidence that there was a causal relationship between his FMLA leave and his reduction in hours. First, the timing between the hours reduction, which he was informed of on March 9, 2017, and his FMLA-protected activity, which concluded on February 17, 2017, was only approximately three weeks apart. Second, Neale clearly was unhappy about the current state of workers' compensation and FMLA leave, writing in an email to a colleague on March 8, 2017 that "[t]he [workers' compensation]/FMLA position issue is out of control on this side of campus." (Pl.'s Br. Opp'n Defs.' Mot. Summ. J., Ex. EE.) We conclude that Morrone's reduction in hours, in conjunction with Neale's obvious frustration with employees taking workers' compensation and FMLA leave, is sufficient for Morrone to establish the third element of his prima facie case of FMLA retaliation.

### 2. *Legitimate, Non-Discriminatory Reason for the Adverse Employment Action*

Defendants further argue they are entitled to summary judgment because they had legitimate, non-discriminatory reasons for terminating Morrone's employment. The burden on the employer to produce a legitimate, non-discriminatory reason is "relatively light" and is satisfied by "introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

As we noted above, Morrone's reduction in hours immediately following his return from FMLA leave constitutes an adverse employment action. Defendants argue that the change in hours was inevitable, as Neale previously discussed with Morrone about the need for him to go to thirty-six hours per week as opposed to forty. Defendants also argue that they had legitimate reasons for terminating Morrone because he made two critical patient errors—the blood gas machine and Flolan incidents—within approximately six months of each other. Accordingly, Defendants have satisfied their burden of introducing legitimate, non-discriminatory reasons for the adverse employment actions.

### 3. *Pretext*

Now that Defendants have established their burden of producing legitimate, non-discriminatory reasons for reducing Morrone's hours and his subsequent termination, the burden then shifts to Morrone to show that Defendants' reasons are pretextual. To do so, Morrone "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an

invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764.

Under the first prong of the *Fuentes* analysis, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997) (quoting *Fuentes*, 32 F.3d at 764). The second *Fuentes* prong requires the plaintiff to "identify evidence in the summary judgment record that 'allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" *Id.* (quoting *Fuentes*, 32 F.3d at 762).

We believe Morrone has come forward with sufficient evidence to show that Defendants' legitimate, non-discriminatory reasons for the adverse employment actions were pretextual under the first *Fuentes* prong. Regarding Morrone's reduction in hours, Defendants claim that the change was inevitable and that thirty-six hours per week is the industry standard. However, as discussed above, there is a genuine dispute of material fact as to the inevitability of Morrone's hours reduction, as Neale and Vogler told Morrone that he would be able to remain at forty hours per week for the next several years. Therefore, after drawing all reasonable inferences in Morrone's favor, he has shown a weakness and inconsistency in Defendants' reasoning on the reduction of hours adverse action.

The Court similarly concludes that there is a genuine dispute of material fact as to whether Defendants' reason for terminating Morrone was pretextual. As noted above, Defendants argue that Morrone was legitimately terminated for a non-discriminatory reason because a patient did not receive necessary medication due to Morrone violating the Flolan

13

policy. While Morrone concedes that Jeanes maintains a policy of having only respiratory therapists administer Flolan, he has put forth evidence that other respiratory therapists have had other hospital personnel administer the medication without any discipline. For instance, Cook testified during her deposition that she has had nurses assist her in setting up the Flolan pump without any reprimand. (Pl.'s Opp'n Defs.' Mot. Summ. J., Ex. I (Cook Dep.) at 12, 22.) In addition, Joann Zimmaro, who was a respiratory therapist at Jeanes from approximately 2002 to 2015, testified it was common practice for nurses to administer Flolan and that, in particular, *Vogler* felt the same way. (Pl.'s Opp'n Defs.' Mot. Summ. J., Ex. J (Zimmaro Dep.) at 15-16, 93-94, 100-01.) Vogler was personally involved in the decision to terminate Morrone, which was allegedly based on the Flolan incident.

Accordingly, Defendants' Motion is denied to the extent it seeks dismissal of the FMLA retaliation claim, as we conclude that Morrone has put forth sufficient evidence to disbelieve Jeanes' legitimate, non-discriminatory reason for terminating Morrone. *See Fuentes*, 32 F.3d at 764.

### C. Workers' Compensation Retaliation

Count II of Morrone's Complaint asserts a cause of action for common law wrongful discharge for workers' compensation retaliation. The Pennsylvania Workers' Compensation Act, 77 Pa. Cons. Stat. §§ 1 *et seq.*, prohibits employers from discharging at-will employees in retaliation for filing a workers' compensation claim. *See Kieffer*, 200 F. Supp. 3d at 539 (citing *Shick v. Shirey Lumber*, 716 A.2d 1231, 1237-38 (Pa. 1998)). Although Pennsylvania courts have not provided the elements of such a cause of action, federal courts have utilized retaliation law from federal employment discrimination statutes. *See id.* (analogizing Pennsylvania workers' compensation retaliation to retaliation under Title VII of the Civil Rights Act of 1964).

Therefore, we will analyze Morrone's workers' compensation relation claim consistent with the framework articulated above with respect to FMLA retaliation.

As before regarding FMLA retaliation, Defendants argue they are entitled to summary judgment on the workers' compensation retaliation count because Morrone cannot establish there is a causal connection between his workers' compensation claim and his termination. Specifically, they point to the fact that Morrone initiated his workers' compensation claim in early December 2016 and was terminated in April 2017 for the proposition that the temporal proximity between the two events was not "unusually suggestive" of retaliation. However, we believe there are factual disputes in the record that demonstrate otherwise.

For instance, Neale was not responsible for investigating workplace injuries or conducting an investigation into an employee's workers' compensation claim. (Neale Dep. 195; Gardner Dep. 108-09.) Nevertheless, she wrote an email on January 24, 2017 that questioned the origin of Morrone's injury. (Pl.'s Br. Opp'n Defs.' Mot. Summ. J., Ex. DD) ("I'm not convinced given the facts, that [Morrone's] injur[y] [is] truly work-related."). Her displeasure with workers' compensation claims and FMLA leave was further on display in her March 8, 2017 email, where she stated that workers' compensation and FMLA leave "is out of control on this side of campus." (*Id.*, Ex. EE.)

As we discussed above, Morrone had his hours reduced upon his return from FMLA leave and had "senior" removed from his respiratory therapist title. In short, we believe Neale questioning the nature of Morrone's injury and her feeling that workers' compensation claims were out of control on her side of campus is sufficient to create a causal link between Morrone making a workers' compensation claim and the adverse employment actions he suffered. Therefore, Morrone has established his prima facie case of workers' compensation retaliation.

15

Now that Morrone has established his prima facie case of retaliation, the burden then shifts to Defendants to articulate a legitimate, non-discriminatory reason for the adverse employment action. *See Budhun*, 765 F.3d at 256. If Defendants carry their burden, then Morrone must point to evidence showing that the reasons are pretextual. *See id.*

Defendants' legitimate, non-discriminatory reasons are the same as argued above with respect to FMLA retaliation. As we concluded above, there are factual disputes as to whether Defendants' reasons are a pretext for retaliation. Accordingly, Defendants' Motion is denied to the extent it seeks dismissal of Morrone's claim of workers' compensation retaliation.

### D. Neale's Personal Liability

Defendants move to dismiss Neale from Count I of the Complaint (the only count asserted against her) on the basis that Morrone cannot establish individual liability against her. Under the FMLA, an "employer" includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I). The FMLA regulations further provide that "individuals such as corporate officers 'acting in the interest of an employer' are individually liable for any violations of the requirements of FMLA." 29 C.F.R. § 825.104(d). Accordingly, the Third Circuit has held that "an individual supervisor working for an employer may be liable as an employer under the FMLA." *Haybarger v. Lawrence Cty. Adult Prob. & Parole*, 667 F.3d 408, 415 (3d Cir. 2012) (footnote omitted).

In the Third Circuit, an individual's FMLA liability is determined using the "economic reality" test, which "depends on the totality of the circumstances rather than on 'technical concepts of the employment relationship.'" *Id.* at 418 (quoting *Hodgson v. Arnheim & Neely, Inc.*, 444 F.2d 609, 612 (3d Cir. 1971)). Relevant factors include "whether the individual '(1)

16

had the power to hire and fire the employee[], (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Id.* (alteration in original) (quoting *Herman v. RSR Sec'y Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)). In evaluating the factors, we are mindful that we "must consider 'any relevant evidence' and '[n]o one of the four factors standing alone is dispositive.'" *Id.* (alteration in original) (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).

In this case, Defendants concede that Neale had the power to hire and fire respiratory therapists in conjunction with the Human Resources Department. (Defs.' Mem. Law. Supp. Mot. Summ. J. 19.) They argue Neale cannot be subject to individual liability because she does not supervise or control employee work schedules or conditions, participate in employees' FMLA leave eligibility, or maintain employee records. (*Id.*) As before, we find there are factual issues regarding whether Neale is subject to individual liability.

Defendants concede that Neale had the authority to hire and fire respiratory therapists. Indeed, she was directly involved in the decision to terminate Morrone's employment. Further, Defendants' assertion that she does not supervise or control employee work schedules or conditions is questionable based on the record. For example, Neale specifically made the decision to reduce Morrone's hours from forty per week to thirty-six. (Pl.'s Br. Opp'n Defs.' Mot. Summ. J. 24, Ex. VV (Email from Neale to Gardner).) In addition, she made the decision to remove "senior" from his respiratory therapist title. (*Id.*, Ex. G at 43.)

Although Morrone has not pointed to evidence that Neale determined his rate and method of compensation or whether she maintained employment records, we conclude that Neale's ability to hire and fire respiratory therapists, along with her authority to alter the amount of hours

17

worked and an employee's title, creates a sufficient factual basis to hold her individually liable under the FMLA.

IV. **CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment is denied.

An appropriate Order follows.